IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENTON DUANE AVERY, | No. C 05-0700 CW |
| Petitioner, | |
| v. | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| SCOTT KERNAN, Warden, | |
| Respondent. | |

INTRODUCTION

Petitioner Brenton Avery, an individual incarcerated at California State Prison, Solano (CSP, Solano), petitions for a writ of habeas corpus under 28 U.S.C. § 2254.  Respondent D.K. Sisto, Warden of CSP, Solano, opposes the petition.[1]  Having considered the parties' papers, the Court DENIES Avery's petition for a writ of habeas corpus.

BACKGROUND

In its unpublished opinion on Avery's direct appeal, the

---

[1] The Court substitutes the current warden, D.K. Sisto, for Scott Kernan as Respondent.

California Court of Appeal described the factual background of the case as follows:

> It was about 7 p.m. on December 19, 2001, and raining heavily when two couples--the Swetts and the Deutsches--emerged from different points in the Coddington Mall. The Swetts and Mr. Deutsch went into the parking lot to their respective vehicles. As Mr. Deutsch approached his truck, he saw three men wearing dark clothes and knit caps standing under a nearby tree. As Deutsch was getting into his truck, he was grabbed and struck in the face. While this was happening, Deutsch noticed that the three men were no longer under the tree. Deutsch was pulled from his truck, punched in the face, and kicked in the ribs (fracturing several) when he was on the ground. He was told to give up his wallet. Apparently discovering that Deutsch did not carry a wallet, the men took his watch and other items. His assailants' faces were covered by ski masks. Filled with fear, Deutsch yelled for help. His yell was heard by Ms. Swett, who--from 50 feet away--saw Deutsch on the ground surrounded by three men in dark clothing and hoods. Seeing Mr. Swett, the three ran. With Mr. Swett in pursuit, the three men jumped into a reddish-orange car and drove away. The crime was reported and police began looking for the car and the suspects.
> It was still raining when approximately 30 minutes later, Morene Garcia and her five children were driving up to the Catholic Charities homeless shelter. She observed two men wearing jackets with hoods nearby. After Ms. Garcia opened her car trunk to remove some belongings, one of the men, who was wearing a ski mask, came up to her. Ms. Garcia told the man he frightened her, to which he replied that was what he was trying to do. The man demanded her purse and money. The other man came up behind her. A third man some feet away yelled to the other that "She doesn't have anything, let's go." When the men started to walk away, Ms. Garcia ran into the shelter and told one of the staff what had happened. The staff member called police. Police arrived within two or three minutes.
> When Ms. Garcia ran into the shelter and reported the incident, another resident of the shelter, Lorin Mitchel, then ran outside because he was concerned for his daughter who was near where Ms. Garcia described the incident as occurring. In the stairwell of a parking structure across the street from the shelter, Mitchel observed two men, one of whom was "pulling down a mask over his face." Mitchel closed to a distance of only five or six feet and was able to identify the man

> as appellant Beck.[2]  Avery came up to Beck and the two were talking when Officer Lazzarini arrived in a patrol car.  Mitchel alerted Lazzarini to Beck and Avery's location and provided their description.  When a red car with its headlights turned off drove past, Officer Lazzarini reported it over his car radio.
> Based on that report, and one of the vehicles seen leaving the mall, the red car was stopped by a number of officers.  Beck was driving; Avery was in the rear seat.[3]  Bech was removing leather gloves, which were wet.  Avery was extremely nervous.  Inside the car police found three ski masks (two of which were wet) and two additional pairs of wet gloves.
> Following defendants' arrest Mr. and Ms. Swett were brought to the scene, where she identified the trio as the parking lot assailants "[b]ased only on size."  She also identified the car as the one in which she saw them drove [sic] away from the mall parking lot.  Mr. Swett was positive that it was the same car, but he made not certain identification of the persons.  Mr. Mitchel was also brought to the scene, where he positively identified defendants.  Ms. Garcia made a partial identification of Beck based on the sweatshirt worn by one of the other men, i.e., the ones who did not demand her money. . . .
> Questioned at the police station by Detective Henry, Beck stated that the car was his and that no else had driven it.

Respondent's Ex. D at 2-4.

Mitchel was one of the prosecution's witnesses at trial.  He was the only witness to make a definite in-court identification of Beck and Avery.  During Mitchel's testimony it was disclosed that he had violated his parole.  It was also disclosed that, in exchange for his testimony, the government promised Mitchel that he would be returned directly to New Folsom prison, the prison where he had earlier been placed, instead of being processed through San

---

[2] The California Court of Appeal consolidated Avery's appeal with that of his co-defendant Jerome Beck.

[3] The front seat was occupied by a man named Rick Robinson, who was charged with the same crimes as Beck and Avery.  Shortly before trial Robinson entered pleas of guilty to the charges.

3

1  Quentin.  This would prevent Mitchel from having a "snitch jacket"
2  placed on his file.
3       On June 28, 2002, the prosecutor received a letter from
4  Mitchel, which stated:

>     Carla,
>          Well today is/was my first day of testimony, let
>     me tell you I don't want to ever do this again.
>          I want to apoligize [sic] to you for how I spoke
>     to you when we first met.  I had know write [sic] to
>     dissrespect [sic] you like that.  Belive [sic] it or
>     not I have more class then [sic] that + should have
>     used it.  So again I am sorry.  I also want to thank
>     you for getting me a straight shot back to New Folsom.
>     There are two things that got me to give my testimony,
>     the straight shot being the second thing.
>          Anyway as you know I parole July 29.  My 64$
>     question is how would you feel about letting me take
>     you to dinner?  It would be my honor. (I would have
>     realy perfered [sic] to ask to your face, but you never
>     seemed to be alone + a lot can happen in 33 days) + I
>     guarantee you tell me what you want to eat, I'll know
>     the best place to go!  So let me know what you decide.
>     If I'm not here, here's my address.

15 Petitioner's Ex. G.
16       The prosecutor brought the letter to defendants' attorneys'
17 attention, and, on July 1, 2002, counsel for Avery's co-defendant
18 Beck requested that the parties meet with the judge outside of the
19 jury's presence.  At that time, both the prosecutor and Beck's
20 attorney had made their closing arguments.
21       After the trial judge reviewed the letter, she asked, "So what
22 is the purpose of bringing this to my attention?"  RT 836.  Beck's
23 attorney responded, "I think that there should be some manner in
24 which it could be introduced to the jury."  Id.  The trial court
25 responded, "The case has been submitted to the jury.  I mean, the
26 evidentiary phase of the case is over and there's been two closing
27 arguments.  I'm going to make it part of the record, but I'm going

to deny the request." Id. Avery's trial counsel proceeded to make her closing argument.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 412 (2000).  A state court decision may not be overturned on habeas review simply because of a conflict with circuit-based law. Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000). However, circuit court decisions may be persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Id.; see also Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 124 S. Ct 446 (2003); Moore v. Calderon, 108 F.3d 261, 264 (9th Cir. 1997).

A state court's decision is "contrary to" Supreme Court law if

5

the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or reaches a different conclusion based on facts indistinguishable from a Supreme Court case. Williams, 529 U.S. at 412-13. A state court's decision constitutes an "unreasonable application" of Supreme Court precedent if the state court "either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." Id. at 407. An "unreasonable application" of federal law is different from an incorrect or erroneous application of federal law. Id. at 412. Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The reasonableness inquiry under the "unreasonable application" clause is objective. Id. at 409.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court considered only state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. See Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001). If

6

the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. <u>Id.</u> at 1232.

DISCUSSION

I. Waiver

Petitioner claims that the trial court's refusal to reopen the case to allow him to present Mitchel's letter to the jury violated his rights under the Sixth and Fourteenth Amendments. Respondent first argues that Petitioner waived this claim because his attorney did not object to the trial court's decision not to reopen the case. Indeed, it was Petitioner's co-defendant's attorney who introduced the letter and requested that the letter be introduced to the jury. RT 836. Petitioner's counsel did not speak during the colloquy regarding the letter. <u>See id.</u> at 835-36.

Because Petitioner's counsel did not seek to have the letter provided to the jury, the California Court of Appeal found that he had not preserved the issue for appeal. In <u>People v. Brown</u>, 110 Cal. App. 3d 24 (1980), the California Court of Appeal held, "On appeal, a defendant cannot take advantage of objections made by a codefendant in the absence of stipulation or understanding to that effect." <u>Id.</u> at 35 (citing <u>People v. Cooper</u>, 7 Cal. App. 3d 200, 205 (1970); <u>People v. Ortega</u>, 2 Cal. App.3d 884, 894-895 (1969)).

The Supreme Court has held,

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and

7

>     actual prejudice as a result of the alleged violation
>     of federal law, or demonstrate that failure to
>     consider the claims will result in a fundamental
>     miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Petitioner suggests that the California court's finding that his claim was waived was not based on an independent and adequate state procedural rule. Petitioner cites various cases in which California courts have found that a failure explicitly to object at trial does not bar a defendant from raising an issue on appeal. For example, Petitioner cites People v. Hill, 17 Cal. 4th 800 (1998), where the California Supreme Court noted several exceptions to the usual rule that "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." Id. at 820 (quoting People v. Samayoa, 15 Cal. 4th 795, 841 (1997)). However, none of the situations cited in Hill are analogous to Petitioner's. For example, the Hill court noted that, in the context of prosecutorial misconduct, a defendant need not object and request a curative instruction "when an objection would be futile because in the circumstances a retraction by the prosecutor or an admonition by the court could not obviate the prejudicial effect of the misconduct on the jury." People v. Green, 27 Cal. 3d 1, 28 (1980).

Here, Petitioner has not established cause for his attorney's failure to join in his co-defendant's counsel's motion or that he was prejudiced by the trial court's decision not to reopen the

8

trial to allow the jury to consider Mitchel's letter.  Moreover, finding that this claim is waived rather than considering it on its merits will not constitute a fundamental miscarriage of justice.  Therefore, the Court finds that Petitioner's claim is waived.

II.  Motion to Reopen Evidence

Even if the Court were to consider Petitioner's claim, there is no basis upon which the petition can be granted.  Petitioner challenges on two bases the trial court's decision not to reopen the case to allow the jury to consider Mitchel's letter.  First, Petitioner argues that the trial court violated his right to due process when, after closing arguments, it allowed the prosecutor to enter into evidence her exhibits, which had already been marked for identification, but disallowed Petitioner's co-defendant's request to reopen evidence to present Mitchel's letter to the jury.  As the Court of Appeal noted, the prosecution's "exhibits had all been authenticated, identified, or used to assist the testimony of witnesses."  Respondent's Exhibit D at 13.  This small procedural allowance to the prosecutor, of which the jury would not even be aware, is not comparable to allowing the defense to reopen the case to present new evidence and argument to the jury.

Next, Petitioner argues that the trial court's decision impeded his ability to present a complete defense.  In Crane v. Kentucky, the Supreme Court held, "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  476 U.S. 683, 690

9

(1986) (internal citations and quotation marks omitted); see also Deptris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear that the exclusion of critical corroborative defense evidence may violate both the . . . due process right to a fair trial and the Sixth Amendment right to present a defense.").

Even if Mitchel's letter can be considered evidence of bias, preventing the jury from considering the letter does not rise to the level of a constitutional violation. As described above, the letter states, "There are two things that got me to give my testimony, the straight shot [back to New Folsom] being the second thing." Respondent's Exhibit G. Presumably the first thing is Mitchel's desire to have a date with the prosecutor. This is the only potential basis for a finding of bias not disclosed to the jury. The jury was already aware of the prosecution's arrangement to have Mitchel returned directly to New Folsom prison.

That Mitchel might have been interested in a date with the prosecutor does not constitute significant defense evidence. The jury was already aware of some factors calling into question Mitchel's credibility. Moreover, there was other evidence, independent of Mitchel's testimony, linking Avery to the crime. The Swetts identified the car in which Avery and his co-defendant were found, Ms. Swett identified Avery based on his size and, at the time of his arrest, Avery possessed the watch taken from Mr. Deutsch.

CONCLUSION

For the reasons set forth above, Avery's amended petition for writ of habeas corpus is DENIED (Docket No. 16).  The Clerk shall enter judgment against Petitioner and close the file.  The parties shall bear their own costs.

IT IS SO ORDERED.

Dated: 9/5/08

CLAUDIA WILKEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

AVERY,

        Plaintiff,

  v.

KERNAN et al,

        Defendant.

Case Number: CV05-00700 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 5, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Brenton Duane Avery T-70275
CSP Sac-New Folsom
300 Prison Rd.
P.O. Box 290066
Represa, CA 95671

Kelly Michelle Croxton
Duputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Dated: September 5, 2008

                              Richard W. Wieking, Clerk
                              By: Sheilah Cahill, Deputy Clerk